DECISION ON OBJECTIONS TO THE MAGISTRATE'S DECISION
{¶ 1} Relator, Randal E. Peters, commenced this original action in mandamus seeking an order to compel the respondent, Industrial Commission of Ohio ("commission"), to vacate that portion of its order declaring an overpayment of temporary total disability ("TTD") compensation from October 7, 2001 through January 9, 2003, Respondents. which was based upon a finding that relator was involved in activity inconsistent with receipt of said compensation, and to enter an amended order holding that relator is entitled to the TTD compensation paid.
 {¶ 2} Pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate of this court who issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) In his decision, the magistrate found that although the commission's decision could have been more clear, the undisputed evidence of record demonstrates that relator engaged in remunerative activities that are inconsistent with receipt of TTD compensation. Moreover, the magistrate noted that the commission's order specifically relied upon the Special Investigations Unit ("SIU") report which relator did not dispute during the administrative proceedings. The SIU report establishes that relator admitted during the January 9, 2003 interview that he typically received $30 in cash per night in tips from customers and he occasionally received $15 to $30 from the bar owner for the work relator performed. Therefore, the magistrate concluded that there was some evidence to support the commission's decision. Because any remunerative activity outside the former position of employment precludes TTD compensation, the magistrate recommended that this court deny relator's request for a writ of mandamus.
 {¶ 3} Relator filed objections to the magistrate's decision first arguing that the magistrate's decision amounts to a de novo review of the commission's order. Relator contends that the magistrate improperly provided the rationale for the commission's decision which was otherwise lacking. We disagree. Although the magistrate did note that the commission's decision could have been more clear, the magistrate found that the evidence upon which the commission based its decision was undisputed. We also agree with the magistrate's interpretation of the commission's decision.
 {¶ 4} Relator also argues that the magistrate incorrectly concluded that relator received remuneration in exchange for his services. Again, we disagree. It is undisputed that relator typically received $30 per night in tips from customers and, in addition, occasionally received $15 to $30 from the bar owner for tending bar. Although the commission did not expressly use the word remuneration, it did find relator's activity to be inconsistent with TTD compensation. We agree with the magistrate's conclusion that the tips relator received from bar customers must be viewed as remuneration for his bartending services. The possibility that relator may not technically have been an employee of the bar owner is not dispositive in determining whether there was some evidence to support the commission's conclusion that relator engaged in activity inconsistent with TTD compensation.
 {¶ 5} Following an independent review of this matter, we find that the magistrate has properly determined the pertinent facts and applied the appropriate law. Therefore, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's decision, we deny the requested writ of mandamus.
Objections overruled; writ of mandamus denied.
Brown, P.J., and Sadler, J., concur.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State of Ohio ex rel. Randal E. Peters, : Relator, : v.
 : No. 04AP-277 Industrial Commission of Ohio
 : (REGULAR CALENDAR) and Diehl, Inc.,
 : Respondents. :
 MAGISTRATE'S DECISION Rendered on September 30, 2004 Gallon Takacs Co., L.P.A., and Theodore A. Bowman, for relator.
Jim Petro, Attorney General, and Shareef Rabaa, for respondent Industrial Commission of Ohio.
In Mandamus.
 {¶ 6} In this original action, relator, Randal E. Peters, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate that portion of its order declaring an overpayment of temporary total disability ("TTD") compensation from October 7, 2001 through January 9, 2003, based upon a finding that relator was involved in activity inconsistent with receipt of said compensation, and to enter an amended order holding that relator is entitled to the TTD compensation paid.
Findings of Fact:
 {¶ 7} 1. On July 24, 1997, relator sustained an industrial injury while employed with respondent Diehl, Inc., a state-fund employer. The industrial claim is allowed for "sprain of neck; cervical radiculopathy; cervical spondylosis; C6-C7 protruding disc; psychogenic pain disorder, NEC," and is assigned claim number 97-486447.
 {¶ 8} 2. The record contains several medical reports. On October 16, 2001, William Richter, M.D., completed an attending physician's report indicating that relator could perform sedentary work involving sitting for five to eight hours during an eight-hour workday. Dr. Richter indicated that relator could stand or walk for six to eight hours during an eight-hour workday. These restrictions were in effect until October 31, 2001.
 {¶ 9} 3. On December 4, 2001, Dr. Richter completed a "Physician's Report of Work Ability" indicating that relator could return to work with restrictions from November 15, 2001 to January 15, 2002. Indicating that the restrictions were permanent, Dr. Richter stated that relator could not lift or carry over ten pounds with his right hand and that relator should not use his left hand or arm at all.
 {¶ 10} 4. On April 22, 2002, relator's treating chiropractor, Evan J. Beane, D.C., completed form C-84. Dr. Beane indicated that at the time relator was injured he was employed at "maintenance fixing heavy equipment" and that he could no longer perform that work. Dr. Beane indicated that relator is able to return to alternative employment. Dr. Beane certified a period of temporary total disability from October 2, 2001 to an estimated return-to-work date of December 30, 2002.
 {¶ 11} 5. Dr. Beane also completed C-84s dated August 9, 2002 and December 3, 2002. Dr. Beane again certified that relator was unable to return to his former position of employment. Temporary total disability was extended to July 1, 2003.
 {¶ 12} 6. The record contains a September 13, 2002 memorandum from relator's rehabilitation specialist: "He is doing a favor for a friend as a bartender a couple night[s] a week, getting tips, he said his attorney told him this was OK. I told him to let BWC know."
 {¶ 13} 7. Information regarding bartending activities was forwarded to the Toledo Special Investigations Unit ("SIU") of the Ohio Bureau of Workers' Compensation ("bureau"). SIU conducted an investigation and issued a report on March 4, 2003.
 {¶ 14} 8. According to the SIU report, in October 2002, two bars/restaurants located in Ney, Ohio, were identified as the location of relator's bartending activities. Those establishments were known as "Mo's Family Restaurant" and "Marty's Country Cookin'" ("Marty's").
 {¶ 15} 9. According to the SIU report, on November 19, 2002, special agent ("SA") Mitchey and fraud analyst ("FA") Owens entered Mo's Family Restaurant and Bar at 12:53 p.m.:
* * * PETERS was observed sitting at the bar drinking a beer; therefore, SA Mitchey and FA Owens took a seat at the bar. * * * PETERS informed SA Mitchey and FA Owens that he bartended on Monday and Tuesday nights from 9:00 pm to close and is "on call" if they need someone to fill in or if the bar gets busy. PETERS also informed that he worked last night (11/18/02) and was working again tonight (11/19/02). In conversation, PETERS indicated that Marty was his boss.
(Emphasis sic.)
 {¶ 16} According to the SIU report, on December 10, 2002, Mitchey and Owens entered Marty's at 4:15 p.m.:
* * * PETERS recognized SA Mitchey and FA Owens and informed them that he would be working tonight (12/10/02) at 9:00 pm and asked if they would be coming back. SA Mitchey and FA Owens inquired when he would be working next as they would not be returning later that evening. PETERS turned to the owner and Marty informed PETERS that he (Marty) was working Monday and Wednesday of next week. PETERS then informed SA Mitchey and FA Owens that he would be bartending Tuesday night of next week. * * *
(Emphasis sic.)
 {¶ 17} According to the SIU report, on December 10, 2002, FA Stein and special agent in charge ("SAC") Sharp entered Marty's at 9:48 p.m.:
* * * Upon entering, FA Stein and SAC Sharp observed PETERS standing behind the bar. The owner of the bar, Marty, was sitting on a bar stool on the patron's side of the bar. FA Stein and SAC Sharp ordered a beverage and PETERS served the drinks, rang up the purchase, and handed SAC Sharp the change. PETERS indicated that he usually works on Monday and Tuesday nights. At approximately 10:00 pm, Marty left the bar and PETERS was the only employee present. PETERS told FA Stein and SAC Sharp that he is sometimes called in to work during the day or on the weekends if another employee is unable to work their shift or if the bar is busy. * * * PETERS also informed that he has cooked while at Marty's on occasion and once worked as a waiter. PETERS further stated that he is responsible to close up and he stays until all the patrons leave and then closes up the bar. PETERS noted that the time he closes varies. There were several other patrons at Marty's and PETERS was observed taking orders, mixing/serving beverages, operating the cash register, and making change. PETERS stated that he started helping out at Marty's on Sunday evenings during a pool league as a favor and then one of the female bartenders was fired and he took over her shifts. * * *
(Emphasis sic.)
 {¶ 18} According to the SIU report, on December 26, 2002, SA Young and SAC Sharp entered Marty's at 2:10 p.m. and, observing relator sitting at the bar, engaged him in conversation:
* * * During the conversation, PETERS indicated some of the different days that he had worked at Marty's and stated that he had recently worked one night until approximately 2:30 am and then came back in the next day to open the bar. PETERS also indicated to SA Young and SAC Sharp that one day one of the female employees did not come in to work and he had to serve the dining room customers once their orders were completed. PETERS also stated that he had recently been working during the evening and decided to use his tip money to buy the people seated at the bar a round of beverages. PETERS stated that the drinks he bought cost approximately $15.00. * * *
(Emphasis sic.)
 {¶ 19} According to the SIU report, on January 9, 2003, SIU agents conducted simultaneous interviews of relator and Martin ("Marty") Spangler, the owner of Marty's. Regarding the interview of relator, the SIU report states:
* * * PETERS informed that he had been working at Marty's as a bartender for approximately one year. PETERS stated that he works a few hours a night and averages one or two days per week. PETERS stated that he never knows what days he is going to work as they vary and that he just helps out Marty as a favor for a friend. PETERS indicated that Marty is aware that he is receiving BWC disability benefits. In terms of payment, PETERS informed that he receives tips and typically receives approximately $30 cash per night. However, PETERS stated that he does not always receive money from Marty but sometimes receives free drinks in addition to his tips. * * * When asked whether he knew that he cannot work and receive Temporary Total disability benefits, PETERS responded, "yes". SA Mitchey asked PETERS whether he notified anyone at BWC that he returned to work and PETERS stated "no", because he did not consider it working as it was not forty hours. * * * FA Owens asked whether he ever notified his attorney or his physician that he was working at Marty's and PETERS said "no" as he does not work often enough. * * *
(Emphasis sic.)
 {¶ 20} Regarding the January 9, 2003 interview of Marty, the SIU report states: * * * Marty stated that PETERS has worked as a bartender at Marty's for approximately one and a half years. * * * When asked what type of compensation PETERS received for the work he performed at Marty's, Marty stated that PETERS has never been paid with a check. Marty continued and stated that PETERS is paid by the free alcohol that he consumes from the bar. Marty indicated that the total amount of alcohol PETERS consumed in one week was approximately $25.00 worth. Marty also stated that he would occasionally provide PETERS with $15.00-$30.00 for the work that he completed at Marty's and that PETERS also kept any tips that he received from the customers while tending the bar. * * *
(Emphasis sic.)
 {¶ 21} 10. On March 4, 2003, the bureau moved to terminate TTD compensation and for a declaration of an overpayment based upon the SIU report.
 {¶ 22} 11. Following an April 7, 2003 hearing, a district hearing officer ("DHO") issued an order granting the bureau's motion. Relator administratively appealed the DHO's order of April 7, 2003.
 {¶ 23} 12. Following a May 21, 2003 hearing, a staff hearing officer ("SHO") issued an order stating:
The order of the District Hearing Officer, from the hearing dated 04/07/2003, is modified to the following extent. Therefore, the BWC motion, filed 03/04/2003, is granted to the extent of this order.
* * *
The evidence reveals that the injured worker helped a friend at a bar. The injured worker was not on the payroll, however, he received sporadic tips from customers and occasionally received a case or two of beer for helping out. The records reflect that the injured worker performed this activity from the summer of 2001 until 01/09/2003.
The injured worker did not believe that he was working. The injured worker helped out one to two days per week acting as a bartender for a small bar in the small town of Ney, Ohio. The activity was minimal, at most 4 to 5 hours for one to two days per week. However, this Staff Hearing Officer finds that it constitutes activity that is inconsistent with temporary and total disability compensation.
Therefore, it is the order of this Staff Hearing Officer to declare an overpayment from 10/07/2001 through 01/09/-2003, the period of time that the injured worker received temporary total disability compensation while also helping his friend in the bar. The overpayment may be collected pursuant to the provisions of O.R.C. 4123.511(J).
The injured worker last worked on 01/09/2003. The medical evidence indicates that the injured worker cannot return to work to the heavy duty former position of employment, and is otherwise disabled. There is no medical opinion in file stating that the injured worker's activities noted on the videotape reveal that he is capable of returning to work at the former position of employment. The injured worker has not reached maximum medical improvement. The minimal activity performed by the injured worker is not sufficient to invalidate the attending physician's opinion on the C-84 forms.
Therefore, temporary total disability compensation shall continue from 01/10/2003 forward upon submission of competent evidence.
This order is based upon O.R.C. 4123.56(A), the Special Investigations Unit report dated 03/04/2003, and the medical records in file.
 {¶ 24} 13. On June 19, 2003, another SHO mailed an order refusing relator's administrative appeal from the SHO's order of May 21, 2003.
 {¶ 25} 14. On March 15, 2004, relator, Randal E. Peters, filed this mandamus action.
Conclusions of Law:
 {¶ 26} It is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 27} TTD compensation is prohibited to a claimant who has returned to work. State ex rel. Ford Motor Co. v. Indus. Comm., 98 Ohio St.3d 20,23, 2002-Ohio-7038. While work is not statutorily defined under the workers' compensation statutes, the Supreme Court of Ohio has identified two types of activities that bar TTD compensation. First, any remunerative activity outside the former position of employment precludes TTD compensation. Id. Second, activities medically inconsistent with the alleged inability to return to the former position of employment bar TTD compensation regardless of whether the claimant is paid. Id., citingState ex rel. Parma Community Gen. Hosp. v. Jankowski, 95 Ohio St.3d 340,2002-Ohio-2336.
 {¶ 28} Thus, a claimant's activities in a workplace environment do not bar TTD compensation if (1) the claimant is not being remunerated, and (2) the duties are not medically inconsistent with the claim that the injured worker cannot perform his or her former position of employment.Parma, supra, at 341.
 {¶ 29} In the magistrate's view, the SHO's order of May 21, 2003, can be criticized for some lack of clarity. Relator was found to have received sporadic tips from customers and occasionally a case or two of beer for helping out. Relator was also found to have engaged in minimal activity, at most four to five hours for one or two days per week. Following these brief factual findings, the order abruptly concludes that the activity is inconsistent with receipt of TTD compensation.
 {¶ 30} Notwithstanding that the SHO's order never specifically finds that the tips from customers and the cases of beer constitute remuneration for the bartending activities, the undisputed evidence of record clearly shows that relator did engage in remunerative activities that are inconsistent with receipt of TTD compensation. Moreover, the SHO's order specifically relies upon the SIU report which relator did not actually dispute during the administrative proceedings.
 {¶ 31} Here, the issue is largely whether the SIU report factually supports the conclusion that relator engaged in remunerative activity that bars TTD compensation.
 {¶ 32} The SIU report undisputedly indicates that relator himself admitted at the January 9, 2003 interview that he typically received $30 in cash per night in tips from customers. In addition to the tips relator received, he also occasionally received $15 to $30 from Marty for the work that he performed.
 {¶ 33} State ex rel. Blabac v. Indus. Comm. (1999), 87 Ohio St.3d 113, is instructive here. Blabac was summarized in Ford, supra, at ¶ 20-21:
* * * In Blabac, the claimant, John Blabac, was getting TTC [temporary total disability compensation] when it was discovered that he was earning wages as a scuba diving instructor. While his partner did the physical instruction, Blabac sat at poolside with a clipboard, grading the students. Id. at 113, 717 N.E.2d 336. Whether he lectured, prepared or graded written exams, or otherwise instructed students was not known.
The commission terminated TTC and declared an overpayment. Blabac argued that only "substantially gainful" work would bar TTC, and that his work was neither substantial nor gainful. We disagreed with Blabac, holding that low paying and sporadic employment was still work. Because Blabac was paid for his efforts, we determined that they constituted work, and barred TTC. We suggested that wage-loss compensation would have been more appropriate for Blabac's circumstances.
 {¶ 34} As the Blabac case itself reveals, at 114, an undercover investigator reported the following conversation he had with John Blabac:
"During this conversation, John stated that he is the scuba diving instructor; he did indicate that he does have a partner. He stated that he teaches several different courses, basic scuba, advanced courses and underwater 2. He indicated that he is an independent instructor and has been diving since 1971, and in 1975 he was an assistant teacher and was certified in 1978.
"The present class that he was teaching had three students and the fee for his first instructional class is $250.00 per person, lasting ten weeks; the class was held on Tuesday nights between 6:30 p.m. and 10:00 p.m. He also stated that he usually takes every class to South or Central America for their open dive exams; he talked about several different places where he has been diving. John also talked about starting a weekend class this summer, hopefully on Saturdays and Sundays. He did state that his fee may be paid in cash or by check and should by made payable to him. When asked if [he] was going to be putting on tanks and [getting] in the water tonight, he said no, that he had messed up his back and would not be getting in the water on this date."
 {¶ 35} Relator's employment as a bartender for Marty's can be characterized as low paying and perhaps sporadic, as was the case inBlabac. Nonetheless, relator was paid for his efforts and he thus engaged in remunerative activity that bars receipt of TTD compensation.
 {¶ 36} Citing Coviello v. Indus. Comm. (1935), 129 Ohio St. 589, relator argues that there was no remuneration for his bartending activities because allegedly there is no evidence in the record of a "contract for hire" between relator and Martin Spangler. Relator's reliance upon Coviello is misplaced.
 {¶ 37} Jo Coviello ("Coviello") was killed while in the discharge of his duties as a taxicab driver in the city of Cleveland. The decendent's mother brought a claim for compensation which the commission denied on grounds that decedent was not an employee of the Zone Cab Corporation, but an independent contractor. The controlling question before theCoviello court was whether the relationship between Zone Cab and decedent was that of employer and employee under the Workmen's Compensation Act. Section 1465-61, General Code was found to be applicable to the question. "Contract for hire" was the operative language under the statute that defined an employee for purposes of workers' compensation. After examining the dictionary definition of "hire," the Coviello court concluded: "[I]t is impossible to have a `contract of hire' without an obligation that the person denominated the employer pay the person employed." Coviello, at 592-593.
 {¶ 38} Examining the written contract entered into by Zone Cab and the decedent, the Coviello court found it to be an agreement for the lease of a taxicab by the former to the latter. The Coviello court found that the written contract did not give rise to the relationship of employer and employee. Also examining facts extrinisic to the written contract, theCoviello court concluded that the relationship of employer and employee did not exist.
 {¶ 39} Relying upon Coviello, relator argues here that he received no remuneration for the bartending activities because allegedly there is no evidence that Martin Spangler was obligated to pay anything to relator. The magistrate disagrees.
 {¶ 40} The cases relevant to the question of whether relator received remuneration for his bartending activities are the mandamus cases addressing a claimant's entitlement to TTD compensation while performing activities for which the claimant was remunerated. The Coviello case is not on point because the issue there was whether Zone Cab was the employer under the Ohio Workers' Compensation Act. The Coviello case did not involve a question regarding entitlement to TTD compensation.
 {¶ 41} Relator's reliance upon Coviello suggests incorrectly that only payments made by an employer qualify as remuneration that can bar TTD compensation. The relevant case law is clearly to the contrary.
 {¶ 42} In the Blabac case previously discussed, Blabac received his remuneration from the fees he charged his students for taking his scuba diving course. Blabac was self-employed with a partner. Blabac's receipt of fees from his students precluded receipt of TTD compensation.
 {¶ 43} In State ex rel. Nye v. Indus. Comm. (1986), 22 Ohio St.3d 75, a case cited by the Blabac court, William D. Nye ("Nye") was receiving TTD compensation for an injury that occurred in the course of his employment with Goodyear Tire Rubber Company. During Nye's receipt of TTD compensation, it was discovered that Nye was self-employed as a furniture reupholsterer. Consequently, the commission terminated TTD compensation and ordered recoupment of the TTD compensation already paid. Nye's remuneration apparently came from his customers for whom he performed furniture reupholstering. Clearly, Nye did not receive remuneration from an employer. The Nye court upheld the commission's decision to recoup the TTD compensation.
 {¶ 44} In this action, it is undisputed that relator received cash payments from his boss, Martin Spangler, and he received tips from bar customers.
 {¶ 45} While there is no evidence in the record that Martin Spangler was obligated to pay relator an agreed upon wage, there is indeed undisputed evidence that Spangler paid cash to relator for his bartending activities. Even if Spangler had the discretion as to how much or how often the cash payments were made, there is no question that Spangler made the cash payments to relator for the purpose of inducing him to continue to provide his bartending services.
 {¶ 46} While a bar patron is ordinarily not obligated to tip the bartender, the receipt of tips can be viewed as a general expectancy of a bartender for work performed. There is no question that there is a causal relationship between the tips received and the bartending services provided. Accordingly, the tips relator received from bar customers must be viewed as remuneration relator received for his bartending services.
 {¶ 47} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.